UNITED STATES of America, Plaintiff–Appellee,

v.

ALEX JANOWS & COMPANY, and Sherwin Janows, Defendants–Appellants.

No. 92–3615.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1993.

Decided Aug. 6, 1993.

---

Barry R. Elden, Asst. U.S. Atty., United States Crim. Receiving, Appellate Div., Chicago, IL, John J. Powers, III, Marion L. Jetton (argued), Dept. of Justice, Antitrust Div., Appellate Section, Washington, DC, James E. Gross, Kent Brown, Dept. of Jus-

tice, Antitrust Div., Chicago, IL, for plaintiff-appellee.

Robert S. Bailey, Paul Bradley (argued), Chicago, IL, for defendants-appellants.

Before POSNER, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Sherwin Janows and his company Alex Janows & Company were found guilty of rigging bids for the construction of commercial kitchens and similar projects in the Chicago area, in violation of federal antitrust law. 15 U.S.C. § 1. We affirm the convictions and sentences.

### I.

Sherwin Janows owned and ran Alex Janows & Company, which designed and installed kitchen facilities for large companies. In the commercial kitchen industry, the designers create plans and blueprints, specifying the equipment that should be used. Some items like stoves are mass-produced, while others like countertops are fabricated to order for a particular project. Once the facility has been designed to its satisfaction, the customer engages a contractor to obtain and install the necessary equipment. Ordinarily, the customer solicits competitive bids to determine which contractor it will employ. Companies like Alex Janows & Company both design and bid to construct and install commercial kitchens. Frequently customers rely on their kitchen designers to recommend a list of bidders for the construction.

From approximately 1984 to 1988, Sherwin Janows conspired with a group of kitchen designers to rig bids for the construction and installation of commercial kitchens. According to their agreement, if the design consultant wanted to perform the installation work, it would recommend the other conspirators to the customer, knowing that they would provide non-competitive bids or refrain from bidding at all. If the customer mentioned a company that was not part of the conspiracy, the consultant would discourage accepting a bid from that company by disparaging its quality. The consultant who planned to be the successful bidder would give the cocon-spirators its pricing figures, to facilitate their submission of higher bids. In the absence of an arrangement like this one, the preparation of bids for a commercial kitchen project is a costly and time-consuming endeavor, requiring the bidder to price hundreds of items. The conspirators avoided this cost by using the numbers supplied by the design consultant who was selected to win the project.

Most of the evidence against Janows came from coconspirator testimony, particularly Frederick Pruim and John Tierney, both of whom had plead guilty to similar antitrust violations. Pruim testified that he participated in bid rigging for over ten projects with Janows and others. Using the conspiracy arrangement to ensure that he was the lowest bidder on projects he helped design, he won seven bids, including the Adlai Stevenson High School and Lake Forest Academy projects. He testified that he had plead guilty to rigging those two projects and had been sentenced prior to Janows' trial. Tr. 840–41, 852–56. He also named three projects which eventually were awarded to Janows and for which he had provided artificially-determined high bids.

John Tierney, president of Equipment Manufacturing Company (EMCO), testified that Janows had enlisted him into the conspiracy in 1985. Tierney described two projects for which he submitted high bids after receiving by messenger the numbers Janows had prepared for the Alex Janows & Company bid. He also corroborated Pruim's testimony that Pruim had requested high bids from Tierney for projects Pruim wanted to win. In 1988, Tierney told Pruim that he would not submit fixed bids in any other projects, but would refrain from bidding in the latest project Pruim had designed. Tierney also testified that his company plead guilty to rigging bids in the St. Joseph's Hospital project (which Janows won) and the Allstate project (which Pruim won) and that he had personally guaranteed payment of the criminal penalty. Tr. 148–154.

The government offered additional corroborating evidence to support its case that Janows conspired to rig bids. Leroy Johnson, one of Janows' estimators who confirmed

that preparing bids requires a substantial investment of time by the contractor, testified that he did not remember preparing bids for the projects Pruim had identified as projects for which Janows had agreed to submit fixed, high bids; he did remember preparing estimates for the ones identified by Pruim as projects rigged for Janows to win. Tr. 754–57, 768–779. Janows could produce no preparation documents on the bids for which Pruim allegedly supplied the numbers, while he did have files on bids prepared by estimating materials and labor costs in the traditional way. Other employees of commercial kitchen design and construction companies testified that Janows or Pruim attempted to solicit "complimentary" or high bids from their companies between 1984 and 1988.

Janows offered the testimony of several customers who awarded his company design and construction contracts and praised the work that he did for them. He also testified in his own defense, portraying himself as an honest, struggling businessman who ran a high-quality shop. Janows claimed to have used "guesstimates" instead of formally prepared bids for projects he did not want, in order to keep his company's name current. His experience in the industry explained the narrow margin between his guesses and the winning bid. He threw away documentation for jobs he did not win because it was useless, and he submitted high bids on projects Pruim won because his primary competitive focus was quality, not price. He emphatically denied ever arranging or rigging bids in order to win contracts.

## II.

The defendant argues that the district court erred in allowing the government to use the guilty pleas in their case-in-chief without a contemporaneous limiting instruction. Essentially, his argument is that the government used the pleas as substantive evidence of Janows' guilt. Before trial, the government moved in limine to be permitted to introduce Pruim's and EMCO's guilty pleas and plea agreements, including mention of them in the opening statements and closing arguments. Dkt. 57. Unfortunately, the district court's ruling was off the record. The problem of reconstructing what issues were considered, what positions the parties took, and what fell within the scope of the judge's ruling is further exacerbated by the lack of a written response to the government's motion. We note that, because the defendant did not object to the admission of, or to any specific use of, the guilty pleas, he must show that the admission and use constituted plain error. *United States v. Davis,* 838 F.2d 909, 917 (7th Cir.1988).

Juries may consider guilty pleas and plea agreements entered by witnesses in assessing the credibility of those witnesses. They may not consider the pleas for the purpose of proving the defendant's guilt. When an alleged accomplice testifies, it is better to give a limiting instruction to be certain that the jury considers the testimony only for its proper purpose. *See id.* We have held, however, that even in the absence of a limiting instruction, the admission of guilty pleas may not be reversible error. *United States v. Braxton,* 877 F.2d 556, 565 (7th Cir.1989); *Davis,* 838 F.2d at 917. We consider the impact of evidence in the context of the whole trial.

The defendant's primary argument is that it was error for the trial court to grant the government's motion and permit the admission of the guilty pleas before the defendant gave any indication that he would use the pleas to undermine the credibility of the government's witnesses. Implicit in the defendant's argument is an acknowledgment of the basic trial strategy to impeach one's own witness "to lessen the blow of cross-examination." *United States v. Shields,* 999 F.2d 1090, 1100 (7th Cir.1993); *Davis,* 838 F.2d at 918; *see also United States v. Mealy,* 851 F.2d 890, 899 (7th Cir.1988) ("The well-established rule in this circuit is that, on direct examination, the prosecutor may elicit testimony regarding the witness' plea agreement and actually introduce the plea agreement into evidence.") (citations omitted). This is fair because "the jury is bound to wonder from the outset why someone should be testifying to all these things that damn him along with the defendant, and having wondered may be shocked or puzzled to discover the reason for the first time on cross-examina-

tion." *United States v. LeFevour*, 798 F.2d 977, 984 (7th Cir.1986). In this case, Pruim and Tierney admitted doing just the things for which Janows was being prosecuted, and their frankness in the face of criminal penalties must have been a curiosity for the jury and might have distracted the jury's attention from the appropriate subject, Janows' actions. A jury is likely to wonder why a witness would willingly incriminate himself, whether or not the defendant intended to impeach the witness' credibility on cross by suggesting a motive for the witness' testimony. Thus, we have previously held that guilty pleas may have relevance to the witnesses' credibility, even without considering the effect of cross examination. *Id.*

Naturally, the government wanted to advise the jury that their main witnesses were testifying pursuant to plea agreements, rather than wait for the defense counsel to accuse the witnesses of doing so. In this case, however, the government went further. It elicited testimony about specific projects in which the witnesses rigged bids with Janows and then immediately afterward asked if the witnesses had plead guilty to rigging that particular project. *See, e.g.,* Tr. 852–56. We fail to see how the specific projects in the pleas were relevant to the only proper purpose for their introduction: the motive behind the witnesses' testimony. In addition, the prosecutor mentioned the guilty pleas in both the initial and rebuttal closing arguments. Tr. 1246–47, 1285. Although the government was ostensibly heading off an attack on their witnessess' credibility, they may have overplayed the card. It would certainly be strange for a prosecutor to argue to the jury that the testimony of government witnesses was suspect because they testified pursuant to a plea agreement. A more plausible explanation is that the government was trying to use the pleas as substantive evidence to bolster their case against Janows.

The defendant, like the government, used the guilty pleas throughout the trial, and they played a significant role for the defense. He discussed them in his opening statement. During cross examination, he vigorously criticized Pruim's testimony based on Pruim's motive to fulfill the terms of his plea agreement and to avoid further prosecution. In his closing argument, the defendant focused on the guilty pleas, arguing the defense theory that Pruim decided to implicate Janows in the bid-rigging scheme in order to satisfy the government after his own illegal business practices had been discovered.

We find that the district court did not plainly err in admitting the guilty pleas and permitting the broad scope of their use in this case. While the questions concerning specific facts in the pleas trouble us, we note the district court's advantage in assessing the prejudice entailed in this evidence. In addition, the district court gave an accurate instruction at the close of evidence on the appropriate use of the pleas (Tr. 1297–98) and we presume the jury followed that instruction. Most importantly, the weight of the evidence against Janows and the jury's opportunity to assess Janows' own credibility during his testimony convinces us that any error in admitting the details of the plea agreements was harmless.

### III.

The defendant next argues that the trial court improperly admitted other evidence and that the prosecutors engaged in a pattern of prejudicial misconduct. We review the district court's decision to admit evidence for an abuse of discretion, "and in so doing, give the trial judge great deference." *Doe v. United States*, 976 F.2d 1071, 1076 (7th Cir.1992). The defendant takes issue with two admissions made under exceptions to the evidentiary rule excluding hearsay. On one occasion, the district court admitted evidence as a statement made by a coconspirator in furtherance of the conspiracy. FED.R.EVID. 801(d)(2)(E). Ben Freed (who had died by the time of trial) told an estimator at his company, William Lafayette, about the bid-rigging conspiracy involving Pruim; Lafayette testified about it at trial. Another witness, Craig Wood, also implicated Freed in the conspiracy, claiming that he and Janows tried to get Wood to join. That testimony supported the fact that Freed was a member of the conspiracy. Freed's disclosure of the conspiratorial arrangement to a

company estimator could certainly be interpreted as a statement in furtherance of the conspiracy.

 The second statement came from another witness, Frank Fiene, who worked with Wood and testified that Wood had mentioned the bid-rigging arrangement to him years before the trial. The district court admitted the testimony as a prior consistent statement, FED.R.EVID. 801(d)(1)(B), after the defendant's counsel had cross-examined Wood about the possibility that his testimony about the bid-rigging arrangement stemmed from a grudge over losing his job. Fiene's testimony rebutted the inference of recent fabrication by Wood. We find no abuse of discretion in admitting either of these statements.

 In assessing a claim of prosecutorial misconduct, we look "first at the remarks in isolation and then in the context of the entire trial." *United States v. Emenogha*, 1 F.3d 473, 481 (7th Cir.1993). If the remark was improper, we determine "whether, in light of the entire record, the defendant was deprived of a fair trial." *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir. 1992). In this case, the prosecutors pursued their theory of the case aggressively, but they remained within the boundaries of legitimate prosecution. We disagree with the defendant that they mischaracterized testimony, although their questions and closing argument contained characterizations imbued with their theory of an antitrust conspiracy. We do find that one remark could be considered improper; in closing argument, the prosecutor stated that Tierney's company "pled guilty to bid rigging with Sherwin Janows and Fred Pruim." Tr. 1246. Especially considering the extensive use of EMCO's plea during Tierney's testimony, the statement in closing might have misled the jury into believing that EMCO's plea included Janows' name or encouraged the jury to use EMCO's plea as evidence of Janows' guilt. The effect of this remark, however, cannot be reasonably said to have affected the verdict. Each side had a fair opportunity to present its case to the jury. The defendant has not shown that this trial suffered from prosecutorial misconduct, much less that such misconduct deprived Janows of a fair trial.

## IV.

 The defendant claims that he received ineffective assistance of counsel at trial. He argues that not only did his counsel fail to object to improper use of the guilty pleas, he also permitted without objection the prosecutor's mischaracterization of witness testimony and he failed to file any post-trial motions. In reviewing a claim of ineffective assistance, we apply the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): First, the defendant must prove that his counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, and second that, but for counsel's deficiency, there is a reasonable probability that the outcome would have been different. *Id.* at 694, 104 S.Ct. at 2068. The defendant bears a heavy burden in showing that his counsel was ineffective and that his defense was actually prejudiced. *United States v. Holland*, 992 F.2d 687, 691 (7th Cir.1993).

The government argues that whatever choices the defendant's trial counsel made were strategic decisions, not errors or lapses. The record shows that the defendant's counsel elicited favorable testimony from several witnesses, conducted vigorous cross-examination, and occasionally objected to testimony. The decision to object to testimony necessarily involves trial strategy. For example, allowing Wood to testify uninterrupted may have undermined his value as a witness because he seemed quite caught up with the idea that the industry was plagued by conspiracies. We also note the trial court's emphatic disagreement with the notion that the representation given by the trial counsel was less than competent, Tr. of Proceedings, 1/11/93, at 3–7, and we recognize the district court's superior position to observe and assess the performance of counsel throughout the pre-trial and trial phases of the litigation. In addition, although several errors in the conduct of the trial are listed, the defendant's appellate counsel has not offered as an example a single post-trial motion which would have been appropriate or had any chance of success.

After reviewing the record, we cannot say that the defendant received ineffective trial assistance. The defendant's counsel presented a consistent theory, that the government witnesses lied to satisfy their plea agreements and that Janows operated an honest business. Janows took the stand to explain away the evidence amassed against him, and he brought in character witnesses to support his business reputation. It is not our job to second-guess the selection of a defense. We have no record to explain why the defendant's counsel did not object to the relatively free-wheeling use of Pruim and EMCO's guilty pleas,[1] but, considering the evidence of a coherent trial strategy, it seems more like a strategic error than incompetence. We cannot make a finding that defendant's counsel was incompetent on basis of this trial record. Even if we could, the second *Strickland* prong requires a showing that the incompetence made the trial fundamentally unfair or made the convictions unreliable. *Holland*, 992 F.2d at 691; *Hollenback v. United States*, 987 F.2d 1272, 1275 (7th Cir.1993) (citing *Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993)). The substantial evidence against Janows prevents him from meeting that high standard.

### V.

■ Next, the defendant argues that the trial court improperly applied the sentencing guideline enhancement for an abuse of a position of trust. Under section 3B1.3 of the guidelines, a district court should add two offense levels "if the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense...." U.S.S.G., § 3B1.3 (1992). The correct application of this guideline requires a two part analysis: First, whether the defendant held a position of trust and second, whether his abuse of the position significantly facilitated the crime. *United States v. Gould*, 983 F.2d 92 (7th Cir.1993). The district court found

that the customers in this industry relied upon their designers for advice in choosing a contractor, including recommendations for companies which should be asked to submit bids. Specifically, the court noted the "disparity in the knowledge and understanding of the parties, such that the customers themselves would be inclined to go along with the program." Sent. Tr. 17.

No doubt the customers' reliance on the designers to select bidding companies facilitated a conspiracy among the bidders to rig the results. The more difficult question is whether Janows occupied a position of trust in the first place. Although their business relationship was guided by contract, the clients depended on Janows to name companies for honest, competitive bidding. The relationship involved a special element of trust which Janows and the other conspirators recognized and exploited to facilitate their conspiracy to rig bids. *Cf. United States v. Kosth*, 943 F.2d 798, 800 (7th Cir. 1991) (parties maintained "standard commercial relationship" in which defrauder was "an ordinary ... customer of the bank"). We find that Janows did occupy a position of trust because customers in the commercial kitchen market routinely rely on the designer's familiarity with the names and reputations of the companies who construct and install kitchens. Therefore, the application of the guideline was appropriate here.

### VI.

■ The only other argument raised by the plaintiff that requires our attention concerns the prosecutor's remarks on "reasonable doubt." Many times in the past, we have been explicit about the inappropriateness of defining "reasonable doubt" to a jury. *See United States v. Lerch*, 996 F.2d 158 (7th Cir.1993) ("It is settled law in this circuit that attorneys should not attempt to define reasonable doubt to a jury".); *United States v. Hall*, 854 F.2d 1036 (7th Cir.1988); *United States v. Glass*, 846 F.2d 386 (7th Cir.1988);

---

1. Because of the difficulty in reviewing ineffective assistance of counsel claims on direct appeal, better alternatives are motions for a new trial or for habeas relief under 28 U.S.C. section 2255. *See United States v. Booker*, 981 F.2d 289, 292 (7th Cir.1992); *United States v. Taglia*, 922 F.2d 413, 417–18 (7th Cir.1991) (filing a § 2255 motion for a new trial may be a better alternative than an argument on direct appeal because the defendant may need extrinsic evidence to prove his lawyer's ineffectiveness). On direct appeal, the defendant has not had the opportunity to question his trial counsel about allegedly incompetent behavior at trial, and we must restrict our review to the trial record.

*United States v. Dominguez*, 835 F.2d 694, 701 (7th Cir.1987) ("We warn prosecutors and defense lawyers ... not to engage in arguments about the definition of reasonable doubt."). It is with some incredulity, therefore, that we read the prosecutor's closing argument in which he informed the jury that "[b]eyond a reasonable doubt means just that. It does not mean proof to a certainty or proof beyond all doubt." Tr. 1252. We look askance at the government's brief in which they shrug off their error by arguing that they merely made a "correct, straightforward observation," instead of defining "what quantum of evidence amounts to reasonable doubt." At argument, our questions were met with a cavalier characterization of the prosecutor's comment as an "unremarkable statement of the law." We find it remarkable. While the prosecutor did not deliberately mislead the jury by suggesting what specific percentage of doubt was reasonable, he never should have broached the subject. It seems simple enough; we admonish counsel, do not define "reasonable doubt" to a jury. In this case, we will not reverse because the error is harmless. There is no chance that a jury would have resolved this case differently, absent the prosecutor's improper "observation."

The convictions and sentences are AFFIRMED.