In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2459

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STEVEN FENZL,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
09 CR 376-1—**Ruben Castillo**, *Judge*.

ARGUED DECEMBER 6, 2011—DECIDED FEBRUARY 23, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. Douglas Ritter and Steven Fenzl were the principals of a waste-management company called Urban Services of America, Inc. Charged with mail and wire fraud relating to a bid by Urban in January 2005 for a contract to refurbish garbage carts for the City of Chicago, Ritter pleaded guilty, while Fenzl, the appellant, was tried by a jury, convicted, and sentenced to 16 months in prison and to pay a fine of $40,000 and make restitution of $35,302.18.

Urban had won similar bids in the past. But in July 2004 the City had opened an investigation of Ritter and Urban on the basis of an anonymous tip that Ritter had cashed checks that the City had written to other contractors. The *Chicago Tribune* published an article about the investigation. Four months earlier, in April, when Urban and one other company had bid for the contract that was rebid in January 2005, no award had been made. Ritter and Fenzl were afraid that even if Urban submitted the lowest qualified bid in the new round of bidding, it wouldn't be awarded the contract, because of the investigation and the bad press and the City's refusal to award the contract the previous April. Although no reason for that refusal had been announced, Ritter and Fenzl may have thought that the City either considered two bidders too few or was hostile to Urban because of the investigation—had it refused to consider Urban's bid there would have been no contest and the City might have been stuck with the other bidder.

The same month as the rebidding, the City closed its investigation without finding any wrongful conduct. But it didn't bother to inform anyone connected with Urban that it had closed the investigation, and Ritter and Fenzl didn't learn it had been closed until months after the new round of bidding.

Urban took measures to improve its chances in the new round. It slashed its bid, and it also sought to interest three companies in submitting bids that would not have done so had it not been for Urban's encouragement (or command: one of the companies was owned

by Ritter and Fenzl). The hope was that if one of those companies won the contract it would subcontract the fulfillment of it to Urban, either directly or by leasing Urban's facilities for refurbishing garbage carts. One of the companies, Roto Industries, had no facilities for doing such work in Chicago, and so it agreed to use Urban's facilities if it was the winning bidder, and of course to compensate Urban for that use. Fenzl explained what the cost to Roto would be of using Urban's facilities; Roto tacked a profit margin onto that cost; and the sum of cost and profit margin was the amount Roto bid.

There were seven bidders in all—Urban and the three companies Urban had contacted, plus three completely independent bidders. Urban was the low bidder and won the contract. The City was unaware of Urban's having communicated with other bidders.

To be allowed to bid, each bidder had to certify that it hadn't "entered into any agreement with any other bidder . . . or prospective bidder . . . relating to the price named in [the bid], nor any agreement or arrangement under which any act or omission in restraining of [*sic*] free competition among bidders . . . and has not disclosed to any person, firm or corporation the terms of this bid . . . or the price named herein." Ritter signed the certification on behalf of Urban. Urban also promised, as required by the City, that if it was the winning bidder and got the contract it would subcontract pieces of it to both a minority business enterprise and a women-owned business enterprise. That was not done, although the judge

ordered Fenzl acquitted of fraud regarding the failure to subcontract to a women-owned, as distinct from a minority-owned, business enterprise.

The prosecutors came from the Antitrust Division of the Justice Department because the Division had originally believed that Ritter and Fenzl had engaged in bid rigging, a form of price fixing in which bidders agree, usually by rotating bids, to eliminate competition among the bidders. *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396, 398 (7th Cir. 2006); *United States v. Heffernan*, 43 F.3d 1144 (7th Cir. 1994); U.S. Dept. of Justice, "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," pp. 2-3, www.justice.gov/atr/public/guidelines/211578.pdf (visited Jan. 4, 2012). The Division intended to prosecute Ritter and Fenzl for a criminal violation of section 1 of the Sherman Act. But at some point it realized it didn't have an antitrust case. Urban had been the low bidder and its aim in "colluding" with other potential bidders had not been to prevent them from underbidding it but merely to buy insurance against its bid's being rejected because of false accusations against Ritter and Urban; if Urban lost the bid, at least it would be able to obtain some refurbishing work as a subcontractor of the winning bidder. The bidders invited by Urban were almost certain to submit higher bids because Urban would be doing the actual work and charging for it and the bidders would be repricing Urban's work in their bids.

It's difficult to see what's wrongful about such a "scheme." Suppose in despair of ever doing work for the

City again Urban had sold its assets to another company and told it, "You go bid on the refurbishing contract." Would anyone think such conduct improper? How different is that from what Urban planned to do in case it was denied the contract even if it was the low bidder? Misconduct in bidding involves trying to reduce rather than increase the competition among bidders. See, e.g., *Habitat Education Center v. U.S. Forest Service*, 607 F.3d 453 (7th Cir. 2010).

So the prosecutors decided to charge fraud rather than an antitrust violation. But consistent with the puzzlement that we've just expressed, the theory behind the charge of fraud for misleading the City by inflating the number of bids was never made clear at trial. No evidence was presented that the more bidders there were, the more likely Urban's bid was to be accepted and that this would result in a higher price to the City for getting its garbage carts spruced up. Had there been four bidders rather than seven, Urban would still have been the low bidder, and there is no indication that the City would have cancelled the auction on the ground that there were too few bidders. Even Urban's fear that the City would not award a contract if there were only two bidders turns out to have been unfounded. The government's principal witness, a City investigator named Kristopher Brown, testified that the reason the contract hadn't been awarded back in April 2004 was not the fewness of the bidders but the fact that the City had botched its specifications for the bids. It had required the contractor to use "Polywelding" (polyethylene welding, a method of molding plastic) to refurbish the

garbage carts, not realizing that only Urban could Polyweld, which would preclude competition for the refurbishing contract. Urban hadn't known that this was the reason no contract had been awarded.

It is conceivable that the City would not have awarded Urban the contract in the second round of bidding had it known the company was trying to insure itself against the consequences of failing to land the contract by encouraging other companies to bid that would subcontract the actual work to Urban. But since we know that the City was willing to award the contract to Urban if Urban was the low bidder, as it was—that any animosity toward Urban was insufficient to induce it to exclude Urban from the bidding process—why would it have balked at Urban's attempt to retain a role in the performance of the contract if someone else was the low bidder? Especially since that someone else couldn't have performed the contract without incurring either large upfront costs because it lacked the necessary facilities in Chicago or large two-way shipping costs if it did the refurbishing elsewhere, and so it couldn't have been the low bidder without enlisting Urban's participation in performing the contract.

Did the garbled certification statement that we quoted forbid what we are calling Urban's effort to insure against failing to win the contract? Read literally, maybe. But really it seems aimed at bid rigging rather than at anything to do with Urban's scheme.

Critical would have been testimony by the employees of the City's Department of Procurement who were responsible for administering the bidding process, and

specifically for deciding who could be awarded the contract and whether Urban's machinations if disclosed would have precluded the award of the contract to Urban even though it was the low bidder. If they would not have precluded its obtaining the contract, then any fraud involved in its lining up additional bidders was immaterial, and therefore not criminal. *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Rosby*, 454 F.3d 670, 673 (7th Cir. 2006); *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002).

But rather than calling any employee of the Department of Procurement to testify, the prosecutors built their case entirely on the testimony of Brown, the City investigator, who was permitted (over objection) to testify—crucially—that had the Department known about Urban's behind-the-scenes activity to insure itself against the consequences of not being awarded the contract it would have disqualified the company from bidding.

Brown's testimony about what the Department would have done had it known what Urban was doing behind the scenes should not have been admitted—certainly not as lay testimony; and no effort was made to qualify Brown as an expert witness, which would have permitted him to give opinion evidence based on hearsay if it was the kind of hearsay on which an expert in his field bases professional opinions unrelated to litigation. Fed. R. Evid. 703. His testimony was hearsay of a peculiarly unreliable sort. He was part of the prosecution team, testifying to impressions gleaned from discussions and observations. Apparently he was not even repeating

what someone had told him, but rather was drawing inferences from stray comments and from things he'd learned in previous investigations. The government argues that he was testifying from his personal knowledge because he knows the practices of the Department of Procurement first hand. But he was unable to point to any rule or policy governing the award of the contract for which Urban and its friendly companies were bidding, and he admitted on cross-examination that he had not been "involved in any discussions whatsoever with anybody in procurement at the time these bids were being considered." Yet his testimony was crucial to the prosecution.

Since Urban was the low bidder, it is a matter of conjecture whether the relevant employees in the Department would have awarded the contract—at a loss to the City—to a higher bidder, in order to punish Urban (for what exactly?). But instead of asking them what they would have done had they known what Urban was up to, the prosecutors asked an investigator what he thought they would have done. What the government dignifies by the term "personal knowledge"—for a lay witness is permitted to base his testimony on his personal knowledge (and on nothing else)—is the investigator's conjectures based on seven years of "training and experience," an impermissible basis for lay opinion testimony. When a DEA agent's "testimony was not limited to what he observed in the search or to other facts derived exclusively from this particular investigation [but] instead, he brought the wealth of his experience as a narcotics officer to bear on those observations and

made connections for the jury based on that specialized knowledge," he was giving expert rather than lay testimony. *United States v. Oriedo*, 498 F.3d 593, 603-04 (7th Cir. 2007). "Inferences [to be admissible as lay testimony] must be tethered to perception, to what the witness saw or heard." *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000). The witness's "reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking"—and therefore was not admissible as lay testimony. *United States v. Garcia*, 413 F.3d 201, 217 (2d Cir. 2005). See also *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1245-46 (9th Cir. 1997).

The most plausible inference from the prosecutors' decision to call Brown, and Brown alone, to testify to the materiality of the alleged fraud is that they had no confidence that the testimony of the officials actually responsible for awarding contracts would have supported the government's case. See 2 *Wigmore on Evidence* §§ 285, 288, pp. 192, 204-09 (James H. Chadbourn rev. 1979). Putting Brown on the stand was like offering hearsay evidence when the out-of-court declarant, though available, is not called as a witness because the party that would call him lacks confidence about what he would testify to or wants to shield him from cross-examination. *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714-15 (2011).

The allegation of fraud with regard to the minority-owned business enterprise presents a different issue,

that of prosecutorial error in closing argument. The prosecutor told the jury that Urban's failure to subcontract any of the refurbishing work to a minority business enterprise was fraud, but in saying this he confused fraud with breach of contract. The bid specifications required the winning bidder to agree to delegate some of the performance under the contract to a minority business enterprise, and there was evidence that Fenzl never intended to give any of Urban's business to such an enterprise. But Roto submitted its bid without specifying a minority business enterprise to which it would subcontract work if it won the contract, saying it hadn't found one yet, and Brown testified that he couldn't say for sure whether Roto's bid, had it been the low bid, would have been rejected: "Each case would have to be decided by [the Department of Procurement Services]"—this hedging shows how weak Brown's evidence was.

So maybe, with Urban being the low bidder, the City would have overlooked its failure to subcontract to a minority business enterprise, had the City learned of that failure. But given the bid specifications and Urban's promise to use such an enterprise if its bid was successful and the evidence that it never intended to do so, there may have been fraud. *United States v. Leahy*, 464 F.3d 773, 787-89 (7th Cir. 2006). The evidence of fraud was not so compelling, however, that we can dismiss as harmless the prosecutor's error in closing argument, which conflated a decision made after the contract was signed not to use a minority business enterprise with

an intention formed during the bidding process not to use one. The latter decision would support a determination of fraud, but not the former.

Fenzl makes two other arguments for reversal of his conviction. The first is that the jury should have been instructed that an exchange of information between competitors (in this case competing bidders) is not illegal per se. That is true, and might be a proper instruction in an antitrust case, but this is not an antitrust case. The relevant question was whether the defendant was guilty of fraud in lining up other bidders without telling the City what it was doing.

Fenzl's other argument is that his fraudulent conduct (if it was fraudulent) was not actionable under the mail- and wire-fraud statutes because there was no proof that the City lost any money as a result. When a fraudulent scheme involves depriving the victim of the fraud of the "honest services" that the defendant owed him, the government must prove that a bribe or kickback was sought from the victim. But such proof has never been required when the aim of the fraud was to enrich the defendant; in such a case there is no requirement that the victim have incurred, or the defendant have intended him to incur, a pecuniary loss. *United States v. Joshua*, 648 F.3d 547, 553 (7th Cir. 2011). If you steal money from a person, it is theft even if you intended to, and did, replace the money before he noticed it was missing.

Though these two arguments by the defendant fail, our earlier discussion shows why his conviction has to be

reversed and remanded with instructions to acquit him of the charge of fraud in enlisting other bidders and to retry him for fraud regarding the minority business enterprise. *Lockhart v. Nelson*, 488 U.S. 33, 39-42 (1988); *United States v. Tranowski*, 702 F.2d 668, 670-71 (7th Cir. 1983).

REVERSED AND REMANDED.