In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2405

WILLIAM H. SILK,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES, MORAINE VALLEY COMMUNITY COLLEGE,
DISTRICT NO. 524,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 01425 — **John J. Tharp, Jr.**, *Judge.*

ARGUED FEBRUARY 12, 2015 — DECIDED JULY 30, 2015

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* William H. Silk was an adjunct professor at Moraine Valley Community College. Silk underwent heart surgery in April of 2010. During the following semesters, Silk's teaching course load was reduced, and his employment was ultimately terminated. Silk filed suit against the College alleging violations of the Americans with

Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). The district court granted summary judgment for the College on all claims. For the reasons below, we affirm in part and reverse in part.

## I. BACKGROUND

*A. Factual History*

Silk began working in 1986 at Moraine Valley Community College in Illinois as an adjunct professor. Adjunct professors are part-time, non-tenure track, at-will employees. They are represented by the Cook County Teachers Union and covered by a collective bargaining agreement. Silk's typical teaching load included four courses during the fall and spring semesters and two or three classes during the summer.

Walter Fronczek was the dean of the Department of Liberal Arts during the relevant period. The dean had ultimate supervisory authority over the faculty in the Department of Liberal Arts. Fronczek was on medical leave for much of the spring 2010 semester. Lisa Kelsay, who was the assistant dean of the Department of Liberal Arts, served as the acting dean during that time. Aileen Donnersberger was a full-time faculty member and the chair of the Social Sciences Department (a branch of Liberal Arts) through the spring of 2010. Ricky Cobb temporarily replaced Donnersberger as chair in the fall of 2010, when she took sabbatical leave.

Donnersberger testified that, as department chair, she was responsible for organizing the course assignments for adjunct professors. Typically, mid-way (or so) through the semester, she would send a form asking the adjuncts to state which courses they would be interested in teaching during

the following semester. She would collect their responses and develop a tentative schedule.

Donnersberger did not have final approval over the proposed staffing—she would send her suggestions to the dean of Liberal Arts. Kelsay testified that the dean would typically defer to the department chair's recommendations. After the dean's approval, the schedule would remain open to any changes (necessitated by staffing issues or student enrollment) until shortly before the start of the semester. Donnersberger testified that the typical protocol of the College was to finalize written contracts with the adjuncts one or two weeks prior to the start of the semester.

In March 2010, Donnersberger sent Silk an offer to teach two sociology courses during the upcoming summer term, which Silk accepted. Beginning on April 19, 2010, however, Silk took a medical leave of absence to undergo heart surgery. He needed a triple bypass. This surgery was completed on April 21, and Silk was discharged from the hospital on April 26. Silk was on medical leave through the remainder of the spring semester, and the record evidence suggests that Silk did not inform the College of any anticipated return date.

Because the remainder of Silk's spring 2010 courses would need to be covered by other faculty during his absence, Fronczek and Donnersberger visited those classes to inform students of the change and to collect information for the incoming instructors. During those visits, they discovered several issues that they considered troubling. The students in at least one class expressed concerns that they had been given only one graded assignment (a quiz) during the semester. In addition, the classes suffered from low student

attendance. Moreover, Fronczek and Donnersberger became aware of problems with the syllabi for the courses: Fronczek characterized the syllabi as "inadequate," and Donnersberger noted that in at least one class, the textbook referenced in the syllabus was not the book actually being used in the course.

By late April, Silk had not yet returned from leave and had not notified the College of a possible return date. Donnersberger testified that she became concerned about coverage for Silk's assigned summer school courses, because the summer session typically began in mid-May. Donnersberger testified that "by the time of April, I had to then—when he was not back yet, I had to find someone to cover his summer classes because it was already the end of April, and we were starting in two weeks for the summer … I then looked for someone else to teach those classes that were scheduled." Kelsay likewise testified that she, Donnersberger, or both determined that Silk should not be assigned summer classes, since they did not know when he would return. His courses were reassigned to other instructors.

In early May, Silk attempted to contact Donnersberger regarding his summer assignments, but he mistakenly sent the email to another College employee with the same last name. On May 5, 2010, Kelsay instructed Silk that before returning for work, he needed to provide the College with a doctor's medical release. She also testified that she informed Silk that his summer classes had been reassigned to another instructor because the College did not know how long his medical leave would last.

Silk received his medical release on May 10, and he provided it to the College on May 12. Silk testified that he want-

ed to maintain his summer school course assignment, although the record is unclear as to whether (and if so, when) Silk communicated that desire to the College. Donnersberger testified that by the time she received Silk's medical release, she had already reassigned the summer school courses. Fronczek testified that he had nothing to do with the decision to reassign the summer courses, as he was on medical leave. On May 17, Silk sent Donnersberger an email stating that he was ready to resume teaching and would be able to take on a full course schedule for the fall 2010 semester.

Fronczek, after returning from his medical leave, scheduled a July 15 meeting with Silk to discuss the issues that Donnersberger and Fronczek had discovered with Silk's syllabi. Silk, Fronczek, Donnersberger, and Cobb participated in the meeting, and Silk's union steward Donald Stewart attended to observe. Fronczek informed Silk that his syllabi contained inaccurate course objectives, no contact information, and no group exercises; in short, none of the elements that Fronczek considered the makings of "a solid class." In addition, Fronczek noted that Silk was not using the correct textbook. Fronczek testified that he perceived Silk to be argumentative and uncooperative during this meeting.

Fronczek testified that he decided on July 15 that Silk should be assigned no more than two courses for the fall 2010 semester, because Fronczek was concerned about Silk's teaching performance. Silk, however, had a different understanding of why Fronczek wanted to assign him fewer courses than normal. Silk testified that at the July 15 meeting, Donnersberger stated that "we" assigned Silk only two classes in the fall because "we didn't think [he was] physically capable of handling them." Donnersberger testified that

there was no discussion of Silk's course assignments at that meeting.

Silk was assigned two courses for the fall 2010 semester. At the beginning of the semester, Fronczek and Cobb determined that they would each observe one of Silk's classes. Fronczek did so on October 15, 2010. Silk testified that Fronczek entered the classroom late and interrupted Silk during an exchange with a student. Fronczek noted that only seven out of twenty-eight enrolled students were in attendance, and that few were paying attention, taking notes, or participating. He witnessed several students talking on their cellphones, playing video games, and talking amongst themselves.

Fronczek had many criticisms of Silk's performance, including Silk's over-relying on his notes; providing misinformation; improperly citing sourceless statistics; not asking questions of the students; and appearing to base his lecture largely on personal experiences. Fronczek testified that after he left the class, several students approached him in the hallway to discuss the poor quality of Silk's instruction. After speaking with them, Fronczek gave the students his business card and told them to contact him if they had any further concerns.

Cobb also attended one of Silk's classes and reported findings similar to Fronczek's. He stated that "Silk's classroom performance was below-average and not to the standards of the Social Sciences Department. Sadly, I consider it one of the poorest exhibitions of instruction I have witnessed at the collegiate level. I do not believe learning was taking place in that classroom." Neither Fronczek nor Cobb made a

written report of their evaluations at that time, and they did not share this feedback with Silk.

Fronczek testified that, at that point, he decided to fire Silk. On November 17, Fronczek instructed the College's human resources director to place Silk on the "do-not-hire list." Various College personnel testified that this list is maintained by the College and includes the names of prior instructors who the College had determined should not be rehired. On November 18, Fronczek informed Silk that there would be no classes "available" for him in subsequent semesters.

In mid-December, a number of students from one of Silk's courses filed a complaint with the College (and met with Fronczek) regarding Silk's instruction. Among other complaints, they stated that Silk had given every student identical comments and the same grade on an essay assignment. Fronczek reviewed the assignments, and he adjusted all of the students' grades upward.

Because Silk had been informed that no further courses would be available for him in Liberal Arts (and presumably because he was not informed that his name had been added to the do-not-hire list), he approached the dean of the Career Programs Department seeking work. He was ultimately assigned to teach two criminal justice courses in that department during the spring semester of 2011.

Fronczek happened to see Silk on campus in January 2011. Fronczek subsequently contacted the College's human resources director to ask how Silk had been rehired, despite being on the do-not-hire list. He also called Peggy Machon, dean of the Career Programs Department, to describe his ex-

periences with Silk. Also in January 2011, Silk filed an EEOC complaint alleging that his Liberal Arts course load had been reduced, and ultimately eliminated, because of age and disability-based discrimination.

Sometime in January, the College's president, Dr. Vernon Crawley, also became aware that Silk had been rehired. Crawley instructed Machon to observe one of Silk's classes. After doing so, Machon reported that several students left immediately after attendance was taken, and others worked on other coursework during class. She also stated that Silk read from the textbook for an extended period of time and used no interactive techniques or instructional aides. She submitted to Crawley a written report of her evaluation. Crawley instructed Machon to fire Silk. Machon sent Silk a letter notifying him that his employment was terminated, effective February 14, 2011.

*B. Procedural History*

Silk filed this federal lawsuit against the College on February 8, 2012, alleging discrimination based on age and disability in violation of the ADEA and the ADA. Silk alleges that he suffered four adverse employment actions as a result of age- and disability-based discrimination: (1) the College "unlawfully rescinded" his summer 2010 course assignments; (2) the College curtailed his fall 2010 course assignments; (3) the College unlawfully terminated his employment by putting him on the do-not-hire list (or eliminating his courses in the Department of Liberal Arts); and (4) the College unlawfully terminated him from teaching in the Career Programs Department. Silk also alleges that the College unlawfully retaliated against him, in violation of both the ADA and ADEA, for having filed an EEOC complaint.

The College moved for summary judgment on all of Silk's claims. The district court granted the motion in its entirety, and Silk appeals.

## II. ANALYSIS

We review *de novo* the grant of summary judgment, "reviewing the record and the inferences drawn from it in the light most favorable to the nonmoving party." *Grayson v. City of Chicago,* 317 F.3d 745, 749 (7th Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

*A. The ADA Claims*

*1. Governing Standard for ADA Claims*

We begin with the Supreme Court's 1989 plurality decision in the Title VII case, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). That case involved what has come to be known as a "mixed-motives" discrimination claim. In a mixed-motives claim, an employer is alleged to have used both discriminatory and legitimate grounds in taking an adverse employment action against an employee. The question presented was whether such a mixed-motive action could violate Title VII.

The Court concluded that it could. *Price Waterhouse*, 490 U.S. at 241. In other words, to violate Title VII, a discriminatory motive need not be the *sole* basis for an employer's adverse employment action. In 1991, Congress amended Title VII to add statutory language making clear that the statute permitted such mixed-motive claims. But, at the same time, Congress limited the relief available to mixed-motive plaintiffs.

In the wake of *Price Waterhouse*, we (along with other circuits) allowed mixed-motive cases to be brought under other anti-discrimination statutes such as the ADA, for example. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 959 (7th Cir. 2010) (collecting cases). But in 2009, the Supreme Court decided *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). In that case, the Court held that because the ADEA lacked the language found in Title VII expressly authorizing mixed-motive claims (the language added following *Price Waterhouse*), mixed-motive claims were *not* authorized under the ADEA. *Gross,* 557 U.S. at 173.

In light of *Gross*, we revisited our mixed-motive jurisprudence in *Serwatka.* In that case, we determined that because the ADA, like the ADEA, did not include language comparable to Title VII's expressly authorizing mixed-motive claims, those claims were not authorized under the ADA. *Serwatka*, 591 F.3d at 962–63. We therefore concluded that in order to satisfy the "because of" standard expressed by the statute, a plaintiff would have to prove that his disability was the but-for cause of his adverse employment action. *Id; see* 42 U.S.C. § 12112(a) ("no covered entity shall discriminate against a qualified individual because of disability") (amended 2008).

But, in a final wrinkle, Congress enacted significant amendments to the ADA in 2008. As relevant here, the language prohibiting discrimination "*because of*" a disability was amended to prohibit discrimination "*on the basis of*" a disability. 42 U.S.C. § 12112(a). Although *Serwatka* was argued *after* the relevant ADA amendment, the pre-amendment law was in effect at the time of the *Serwatka* defendant's alleged violations. So we analyzed that case using

the "because of" and not the "on the basis of" language that the statute now provides.

We noted in *Serwatka*, however, that because the post-amendment ADA was not at issue, "[w]hether 'on the basis of' means anything different from 'because of,' and whether this or any other revision to the statute matters in terms of the viability of a mixed-motive claim under the ADA, are not questions that we need to consider in this appeal." *Serwatka*, 591 F.3d at 961 n.1. So it is an open question whether the but-for standard we announced in *Serwatka* survived the amendment to the ADA.

Numerous district courts have noted the same uncertainty we identified in *Serwatka*. And while the College raises the question of whether *Serwatka*'s rule applies post-amendment—i.e., whether the "on the basis of" language changes the analysis—it does so in a cursory footnote and without any briefing. Silk offers no meaningful guidance in his reply brief. Without the benefit of adequate briefing on the issue, we will not resolve this important question. Because Silk argues that his claims succeed even under the but-for standard announced in *Serwatka*, we apply that standard here. We reserve resolution of this question for a case in which the issue is squarely before us and adequately briefed.

*2. Establishing the ADA's Applicability*

The ADA provides that "no covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Disability is defined as (a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an

impairment. 42 U.S.C. § 12102(1). In order to succeed on his claim, Silk must provide sufficient evidence "from which a reasonable jury could conclude that he was an individual with a disability within the meaning of the statute." *Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011).

Silk raises his claims under prong (c)—he contends that the College regarded him as having an impairment. In satisfying the "regarded as" prong, Silk must show that the College perceived him as having an impairment, "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

The "regarded as" prong does not apply, however, "to impairments that are transitory and minor. The statute specifies that a transitory impairment is one "with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). The statute does not define what constitutes a "minor" impairment.

In an effort to head Silk off at the pass, the College argues that Silk's impairment qualifies as both transitory and minor, and thus that Silk is not covered by the ADA. This would block Silk's claims from the outset. In raising this argument, the College bears the burden of establishing that the impairment was both transitory and minor. In addition, the College "may not defeat 'regarded as' coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor." 29 C.F.R. § 1630.15(f). Instead, the standard is an objective one: the College must prove that the perceived impairment actually was transitory and minor. *Id.*

We agree with the district court that the College has not demonstrated that Silk's impairment was both transitory and minor. Absent a more precise definition from Silk, we assume that his impairment (or perceived impairment) was a heart condition severe enough to require triple bypass surgery. While the College seems to characterize the bypass surgery itself as the impairment, we agree with the district court that the surgery was the treatment, not the impairment. The College has therefore not established that such a heart condition is transitory, because it has provided no evidence as to how long such a condition would last. Likewise, the College has presented no evidence to establish that such a condition could be considered "minor."

Thus, Silk has passed the first hurdle *en route* to summary judgment. We consider Silk's argument that the College regarded him as having an impairment in the course of evaluating each of his claims.

### 3. *Summer 2010 Course Reassignment*

Silk does not attempt to prove his claim under the "indirect" *McDonnell Douglas* method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). So he necessarily proceeds under the "direct" approach. In doing so, he may provide either "smoking gun" evidence of discrimination, or he may put forward circumstantial evidence that would permit an inference of discrimination. That evidence can include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment ac-

tion." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013). Silk employs the direct method in each of his discrimination and retaliation claims.

Silk argues that the College impermissibly decided to re-assign his summer 2010 courses because it regarded him as having a disability. In order to succeed on his claim, Silk must prove that (1) the decision-maker regarded him as having an impairment; and (2) she made her employment decision on the basis of that perception. We assume that Donnersberger, as department chair, and Kelsay, as acting dean, were the decision-makers in this employment action.[1] Silk's claim fails because he cannot establish that the decision-makers regarded him as having an impairment.

To demonstrate that the College regarded Silk as having a disability, he must show that the decision-maker perceived that Silk suffered (or would suffer from) an impairment *at the time that he would be teaching the summer courses.* Silk needed to be physically present in order to teach those courses. Silk appears to concede that, at the time that he took leave, he did not alert the College as to a possible or probable return date. And Silk does not dispute Donnersberger's or Kelsay's testimony that as of two weeks prior to the start of the summer session, the College did not know whether he would return in time to teach the summer classes.

Donnersberger testified that she became concerned in late April about her staffing needs for the summer. She stated that, "by the time of April, I had to then—when he was

---

[1] Silk seems to suggest that Fronczek was also a decision-maker. We cannot draw that conclusion, however, because it is undisputed that Fronczek was on medical leave at the time that this decision was made.

not back yet, I had to find someone to cover his summer classes because it was already the end of April, and we were starting in two weeks for the summer … I then looked for someone else to teach those classes that were scheduled." So, Donnersberger testified, she had already reassigned Silk's courses prior to him informing the College that he could return in time to teach.

This evidence suggests that Donnersberger, the decision-maker, regarded Silk as *absent* during the relevant time period—not as suffering from a disability. Silk does not provide any evidence to contradict Donnersberger's testimony on this point.

In addition, Kelsay made clear to Silk that he would not be eligible to teach any courses until he provided the College with a medical release. Silk does not argue that the medical release requirement was improper, and he concedes that he would not have been permitted to return to work without it. He has provided no evidence to suggest that the course assignments were made after May 12, when he submitted his release.

Because Silk cannot establish that the College regarded him as an individual with a disability, we affirm the district court's grant of summary judgment on this claim.

*4. Fall 2010 Course Assignment*

Silk next claims that he was assigned only two courses during the fall semester of 2010, instead of his usual four, as the result of impermissible discrimination. By the time this decision was made, Fronczek had returned from medical leave. So we assume Fronczek and Donnersberger were the decision-makers in this employment action.

Silk's claim rests on one disputed fact. He alleges that during the July 15 meeting attended by Silk, Donnersberger, Cobb, Fronczek, and Stewart, Donnersberger stated that "we" assigned Silk only two classes in the fall because "we didn't think [he was] physically capable of handling them." Silk alleges that "we" refers to Donnersberger and Fronzcek. Donnersberger denied having made any such statement, and she testified that there were no discussions of Silk's fall 2010 course assignments at that meeting.[2]

According to Silk, this statement demonstrates that Fronczek and Donnersberger both regarded him as having an impairment and reduced his course assignments on the basis of that perception. There is a genuine dispute over whether that statement was actually made: Donnersberger testified that she didn't make the statement, and Silk testified that she did. In addition, that fact is material to Silk's case: if a jury credited Silk's testimony and not Donnersberger's, it could reach the conclusion that the statement constituted an admission on the part of the College that it reduced Silk's course load as the result of a perceived impairment.

We therefore conclude that summary judgment was not appropriate on this claim.

*5. Terminations*

Silk argues that the College twice terminated his employment based on the perception that he was an individual with a disability: first, when he was notified during the fall

---

[2] In his briefs, Silk erroneously claims that "there is no dispute" that this statement was made. The dispute is clear—Donnersberger attested that she never made the statement attributed to her.

2010 semester that he would not be assigned any future courses in the Department of Liberal Arts (and was placed on the do-not-hire list); and second, when he was given a notice of termination by the Career Programs Department in February of 2011. Silk claims that the district court should have excluded any reference to the do-not-hire list, based on his contention that the list did not exist prior to his filing of an EEOC complaint. This claim is without merit.

As for the first termination, the parties agree that Fronczek was the decision-maker. Silk appears to argue that Donnersberger's alleged statement regarding the reduction in Silk's fall 2010 schedule constitutes evidence that Fronczek regarded Silk as an individual with a disability at the time that he was terminated. This claim is tenuous, at best. But even assuming that Silk could establish that Fronczek regarded him as having an impairment, his claim fails. Silk does not present any evidence that would permit an inference of discrimination.

Silk must establish that his perceived impairment was a but-for cause of his termination. Fronczek, however, testified that he terminated Silk's employment *solely* because he believed the quality of Silk's instruction to be poor. The record evidence amply supports that reason. Recall the problems with Silk's syllabi, including the fact that he was using the wrong textbook in at least one course; poor attendance in Silk's courses; a non-participatory classroom environment in which students played video games, talked amongst themselves and on the phone, and did other course work during class; problems with Silk's lecture techniques; a variety of student complaints, including that Silk had given every student identical comments and grades on an essay assignment;

and Cobb's assessment that "Silk's classroom performance was below-average and not to the standards of the Social Sciences Department, " and that "it one of the poorest exhibitions of instruction [he had] witnessed at the collegiate level." Cobb did not believe students were learning in Silk's classroom.

Fronczek's belief constituted a legitimate, non-discriminatory reason for terminating Silk's employment. While Silk concedes some of those pieces of evidence, he argues that others were inaccurate. But "although [Silk] disagreed with his negative evaluations, that does not mean that the evaluations were the result of unlawful discrimination." *Dickerson v. Bd. of Trs. of Comty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (citing *Brill v. Lante Corp.,* 119 F.3d 1266, 1273 (7th Cir. 1997) ("The question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*." (emphasis in original)). Silk argues that many of these negative assessments were wrong, but he puts forward no evidence to suggest that Fronczek did not *honestly believe* that Silk was a bad instructor.

As for Silk's second termination, in February of 2011, his claim cannot get off the ground. Indeed, Silk's arguments on this claim are arguably waived for failure to develop. But, as best we can discern, Silk does not dispute that the College's president (Crawley) directed the dean (Machon) to issue the letter of termination. Silk offers no evidence that Crawley (or Machon, for that matter) was aware that Silk had undergone bypass surgery or had a history of a heart condition. So Silk cannot establish that Crawley regarded him as an individual with a disability.

Silk contends that Fronczek wielded influence over Crawley (based on Fronczek's own perception that Silk suffered from an impairment), and convinced Crawley to terminate Silk's employment. We will not belabor the point—Silk offers no evidence in support of such a contention, and summary judgment was properly granted on that claim.

*B. ADEA Claims*

In the district court, Silk raised ADEA claims that mirror the ADA claims described in Part A. He appeals summary judgment only on his claims that his employment was wrongfully terminated, in violation of the ADEA.

Apart from stating his claim for relief, Silk makes no argument in support of such a claim in his briefs to this court. As we have repeatedly held, "[t]he absence of any supporting authority or development of an argument constitutes a waiver on appeal." *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004). Silk has waived his ADEA discrimination arguments.

*C. Retaliation Claim*

In January 2011, Silk filed an EEOC complaint, alleging discrimination based on age and disability. The only adverse employment action he suffered after this date was the termination of his employment in February 2011. He alleges that this termination occurred in retaliation for his having filed the EEOC complaint.

Both the ADA and the ADEA prohibit employers from retaliating against employees who exercise their rights under those statutes. In order to prove a claim of retaliation, the employee must show "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a

causal connection between the two." *Dickerson*, 657 F.3d at 601. The parties agree that Silk engaged in a statutorily protected activity (his EEOC complaint), and that he suffered an adverse employment action (his termination). Again, Silk's ADEA claim is waived for failure to develop.

As with his discrimination claim, Silk does not identify who was responsible for his termination. Assuming it was either Fronczek or Crawley, he provides no evidence that either was aware of his EEOC complaint. And even assuming they were aware, the College offers two legitimate, non-discriminatory reasons for his termination: (1) that the Career Programs Department erred in hiring Silk, given that he had been added to the do-not-hire list; and (2) that the Career Programs Department, like Liberal Arts, made a negative assessment of the quality of Silk's instruction.

Silk does not offer any evidence that contradicts these legitimate, non-discriminatory reasons. Silk contends, without offering any evidence in support, that the do-not-hire list didn't exist prior to his EEOC complaint. He likewise offers no evidence to contradict the College's evidence of the list's existence. Second, while he again disputes the correctness of the College's assessment of his teaching abilities (Machon's evaluation, in this case), he does not offer any evidence to suggest that Crawley and Fronczek did not *honestly believe* that Silk was a poor instructor.

The only piece of evidence that Silk offers in support of his claim is the "suspicious timing" between the filing of his EEOC complaint and his termination. It is true—Silk was fired within a few weeks of filing his complaint. But suspicious timing alone "will rarely be sufficient ... to create a triable issue." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734

(7th Cir. 2008) (quoting *Culver v. Gorman,* 416 F.3d 540, 546 (7th Cir. 2005)); *see also Burks v. Wisconsin Dept. of Trans.,* 464 F.3d 744, 758–59 (7th Cir. 2012) (explaining that "suspicious timing alone … does not support a reasonable inference of retaliation" because the "mere fact that one event preceded another does nothing to prove that the first event caused the second" (internal citation omitted)).

### III. CONCLUSION

For the reasons above, we AFFIRM in part and REVERSE in part. We REVERSE the district court's grant of summary judgment on Silk's "fall 2010" discrimination claim and REMAND for further proceedings consistent with this opinion. We AFFIRM the district court's ruling on all other claims.