In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-3261

ALWAYS TOWING & RECOVERY, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF MILWAUKEE, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-00919 — **Nancy Joseph**, *Magistrate Judge*.

ARGUED APRIL 21, 2021 — DECIDED JUNE 24, 2021

Before FLAUM, SCUDDER, and KIRSCH, *Circuit Judges*.

FLAUM, *Circuit Judge*. This case is about the scrap metal recycling business—the collection and processing of ferrous (iron-based) and nonferrous metals. Plaintiffs-appellants, an assortment of companies that tow or recycle used cars, allege that defendants-appellees, the City of Milwaukee ("the City") and its subcontractor, engaged in anticompetitive behavior to self-allocate towing services and abandoned vehicles, a primary input in that industry.

Among other claims, plaintiffs allege that a contract the
City entered into with one of the area's largest recycling pro-
viders, defendant-appellee Miller Compressing Co., violates
§ 1 of the Sherman Act, 15 U.S.C. § 1 *et seq*. Plaintiffs assert
that the contract provided direct evidence of an agreement to
restrain trade. We agree with the district court's judgment
that plaintiffs failed to state a claim upon which relief could
be granted because they did not plead an unreasonable re-
straint on trade, and we therefore now affirm.

## I.    Background

### A.  Factual Background

Always Towing & Recovery, Inc., Apys Cars, Inc., Brew
City Towing, LLC, SP Towing, LLC, and Adams Recycling,
LLC (collectively, "plaintiffs") are among the various players,
both private and public, that tow, sell, and buy vehicles for
scrap recycling in and around Milwaukee. The City under-
takes various roles—regulating that process, as well as citing,
towing, and disposing of abandoned and unlawfully parked
vehicles.

Plaintiffs allege that the City, its various subdivisions, and
a Milwaukee-area recycling provider called Miller Compress-
ing conspired to improperly divert scrapped vehicles and al-
locate towing services through a decades-long exclusive con-
tract. Plaintiffs further allege that the City and Miller Com-
pressing reinforced their market positions through a conspir-
acy to regulate private tow truck companies along the way.

In light of these allegations, the intersection of laws gov-
erning the removal of unlawfully parked vehicles on the one
hand and the ways in which the City and various players dis-
pose of such vehicles on the other is therefore relevant to this

case. We will thus proceed by briefly describing the regulatory backdrop and the City's enforcement actions against plaintiffs before turning to the City's disposal of vehicles and the contract central to this appeal.

Regarding the City's regulatory role, by plaintiffs' account, the City has not only enacted, but also enforced regulations to prevent plaintiff towing companies from performing private and public tows. Plaintiffs take issue with the City's enactment of various ordinances that govern the towing of unlawfully parked vehicles. For example, during the period relevant to this case, the Milwaukee Common Council approved a series of laws that require a City-issued license to tow vehicles from certain areas, that obligate towing companies to provide various notices, and that cap maximum charges imposed on vehicle owners who have illegally parked or abandoned their vehicles. *See generally* A Substitute Ordinance Relating to the Licensing and Regulation of Recycling, Salvaging and Towing Businesses and Activities, No. 141893 (codified as amended at Milwaukee, Wis., 1 Reg. Ordinances, ch. 93 *et seq.*, Recycling, Salvaging and Towing Regulations (2021)). In plaintiffs' view, the City has also enforced these laws to squeeze them out of the market. To illustrate these allegations, we note that plaintiffs challenge the City's denial (or nonrenewal) of licenses to three of the four plaintiff towing companies named in this case: Apys Cars, Inc., SP Towing, LLC, and Brew City Towing, LLC.

Regarding the City's disposal role, plaintiffs also call into question the City's approach to vehicle towing and its sale of statutorily defined "abandoned" vehicles. *See* Wis. Stat. § 342.40(1m) (defining abandoned vehicles and authorizing municipalities to designate as such). In addition to

authorizing removal, Wisconsin law permits municipalities to dispose vehicles covered by the statute, for example, through sale or donation (subject to certain notification, impound-ment, and procedural requirements). *See id.* § 342.40(2), (3)(c) (authorizing sale or donation after procedures satisfied). Plaintiffs' allegations focus on two aspects of the City's pro-cedures. First, plaintiffs allege that the City improperly de-nied Apys Cars's bid for a subcontract to perform some of the City's tows from public property to a City-operated lot. How-ever, plaintiffs also concede that the City informed Apys Cars that although it had submitted the lowest bid, further due dil-igence later revealed that Apys Cars lacked the financial wherewithal to carry out the contract.

Second, and at the heart of this appeal, plaintiffs claim the City improperly promised to sell a significant portion of its abandoned vehicle inventory to just one company: Miller Compressing. Plaintiffs allege that the Miller Compressing-City arrangement dates back to 1996 or 1997. The Complaint noted that Nick Adams, current owner of plaintiff Adams Re-cycling, witnessed the parties enter (some version of) this deal. Further, they allege that by 2003, the City entered a for-mal contract with Miller Compressing ("the 2003 Contract") that is intended to remain in effect through 2023.

The services, price, quantity, and duration of the 2003 Contract are also relevant. As to services, the City agreed to sell Miller Compressing a percentage of scrapped vehicles at a fixed cost and to pay Miller Compressing to evacuate fluid from cars and tow vehicles to Miller's facilities. As to price, Miller Compressing thus committed to purchase scrap vehi-cles at a set price (subject to certain price indexing) less costs for transporting and removing fluids and refrigerants from

the vehicles. As to quantity, the City promised to provide Miller Compressing a certain percentage of its scrap vehicles for specific periods (at least 80% of those disposed in a calendar year, 75% of those disposed in a calendar month, and 80% of those disposed from January 1 through September 30 in a calendar year, in addition to 98% of health-nuisance tows disposed of in a year). Finally, regarding duration, the 2003 Contract lasted for seven years with the possibility of a three-year extension, and in 2009, the parties renewed their agreement through October 2023. Plaintiffs also allege that the City earned more than $5 million in revenue through this arrangement between 2004 and 2009 alone.

Beyond the exclusive terms of the 2003 Contract, plaintiffs claim the deal circumvents certain requirements the City faces in the sale of vehicles and procurement of towing services. For example, they contend that the City must auction its abandoned vehicle inventory through a public system called "J-BID" but that the 2003 Contract bypasses that process. Miller Compressing either does not bid on J-BID inventory or (if it does place bids) does not place the highest bids, but Miller nevertheless obtains the vehicles. Plaintiffs also allege that the City evaded the City's own generic procurement obligations by entering into the agreement with Miller Compressing without issuing a public solicitation for bids.

### B. Procedural Background

Plaintiffs filed suit in federal district court against the City, the Milwaukee Department of Public Works, the Milwaukee City Tow Lot, and the Milwaukee Police Department (collectively, "City defendants"). Plaintiffs alleged that City defendants violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Act, 15 U.S.C. § 12 *et seq.*, and committed

tortious interference with contract under Wisconsin common law. The City moved to dismiss all counts of the complaint.

Plaintiffs then moved for and were granted leave to file the operative first amended complaint ("the Complaint"). In addition to the previously filed claims, the Complaint added Miller Compressing as a defendant and alleged that Miller Compressing entered into an agreement with the City in violation of § 1 of the Sherman Act. The Complaint also alleged two additional counts against City defendants and Miller Compressing for violations of the Federal Trade Commission Act, 15 U.S.C. § 45, and the Pollution Prevention Act, 42 U.S.C. § 13101. Finally, plaintiffs attached to the Complaint an unexecuted copy of the 2003 Contract.

City defendants and Miller Compressing each moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The district court granted both motions on all federal counts and released supplemental jurisdiction over the state law claims. Most relevant to this appeal, the district court premised its dismissal of plaintiffs' § 1 Sherman Act claim on the failure to allege a plausible antitrust agreement or conspiracy under the pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The district court then dismissed all the federal claims with prejudice because it reasoned that any further amendment would be futile.

Plaintiffs timely appealed.

## II.    Discussion

On appeal, plaintiffs assert that the Complaint stated a cognizable claim for relief under § 1 of the Sherman Act. In

reviewing a motion to dismiss, we accept all well-pleaded facts as true and draw reasonable inferences in plaintiffs' favor. *See Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012). A Rule 12(b)(6) dismissal turns on a question of law, which we review de novo. *Id.*

Plaintiffs also assert in the alternative that the district court erred by dismissing their claims with prejudice. Although "[g]enerally, denials of leave to amend are reviewed for abuse of discretion," *Int'l Union of Operating Eng'rs, Loc. 139 v. Daley*, 983 F.3d 287, 294 (7th Cir. 2020) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015)), the district court here denied leave to amend on futility grounds. Accordingly, we review the underlying legal basis de novo. *Id.* ("[R]eview of futility-based denials includes *de novo* review of the legal basis for the futility." (internal quotation marks and citation omitted)).

## A. § 1 Sherman Act Claim

Plaintiffs primarily bring this suit under § 1 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." *See Agnew*, 683 F.3d at 334 (alteration in original) (quoting 15 U.S.C. § 1). The Sherman Act is designed "to protect consumers from injury that results from diminished competition," and therefore a claim brought under the Act must allege both "injury to [the plaintiff]" and "to the market." *Id.* at 334–35 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). To state a claim for relief under § 1, a plaintiff must show the following three prongs: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Id.* at 335 (alteration in

original) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).

To survive a motion to dismiss, *Twombly* requires that the existence of an agreement that violates § 1 of the Sherman Act "be pleaded plausible through allegations of fact." *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019). "Such allegations usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Id.* "The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement … ." *Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018).

The district court here determined that the Complaint failed to state a claim for relief under § 1 of the Sherman Act. In reaching its conclusion, the district court relied on two reasons. First, the court focused on plaintiffs' allegations regarding the City's enactment of certain licensing requirements, notifications, and fees in 2015 and its subsequent denial of licenses to plaintiffs. The court concluded that plaintiffs had not plausibly linked the alleged circumstantial evidence to an agreement between the City and Miller Compressing to create an injurious regulatory scheme.

Second, the district court shifted to the 2003 Contract and reasoned that this agreement did not give rise to a plausible inference that City defendants and Miller Compressing conspired to control the recycling, towing, and salvaging market. The district court explained that, at most, one could infer from the 2003 Contract that the City violated its procurement

obligations, rather than antitrust law but "[n]one of these al-
leged facts … collectively give rise to a plausible inference
that an agreement existed between the City and Miller Com-
pressing to unlawfully control the recycling, towing, and
salv[ag]ing marke[t] in Milwaukee."

On appeal, plaintiffs do not appear to challenge both the
district court's bases for dismissing the § 1 claim.[1] Instead,
they focus on the district court's conclusion regarding the
2003 Contract. In their view, the district court misapplied the
*Twombly* standard to the 2003 Contract. The Complaint pre-
sented the 2003 Contract as *direct evidence* that Miller Com-
pressing and City defendants entered a contract to restrain
trade but that the district court treated the 2003 Contract as
*circumstantial evidence*. Stated differently, plaintiffs assert that
there is no need to draw any inferences from the contract to

---

[1] Plaintiffs do not clarify whether they intend to challenge the district
court's first basis for concluding that the § 1 Sherman Act claim was not
satisfied. As noted above, the district court's first reason was that plain-
tiffs' circumstantial evidence—for example, the enactment and enforce-
ment of the towing licenses—did not raise a plausible inference that the
City and Miller Compressing conspired to enact the City's regulatory
scheme. However, plaintiffs do not develop any argument regarding that
circumstantial evidence on appeal.

Even if plaintiffs had raised and developed the argument that this reg-
ulatory conduct constituted an agreement, the circumstantial evidence
would not have been dispositive to this appeal. We agree with the district
court's well-supported view that the regulatory conduct here is insuffi-
cient circumstantial evidence to plead a plausible agreement for § 1 of the
Sherman Act. In this case, plaintiffs' allegations did not "tend[] to exclude
the possibility' that the [City] acted independently" of Miller Compress-
ing to enact ordinances and regulate plaintiffs. *See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

satisfy the Sherman Act framework: the contract itself is the unlawful agreement.

There is no question that plaintiffs alleged a contract between Miller Compressing and the City. However, plaintiffs have not carried their burden to show a "resultant unreasonable restraint of trade in [a] relevant market," *see Agnew*, 683 F.3d at 335, through the 2003 Contract. The inability to state a claim for relief on any one of the three prongs ends our inquiry because "a plaintiff must prove three elements to succeed under § 1 of the Sherman Act," and thus dismissal was appropriate. *Id.*

"[E]very contract is a restraint of trade, and as [the Supreme Court] ha[s] repeatedly recognized, the Sherman Act was intended to prohibit *only* unreasonable restraints of trade." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984) (emphasis added); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (explaining that the Court has never interpreted § 1 to proscribe all contracts, "only unreasonable restraints" (citation omitted)).

We draw on several analytical frameworks to assess whether a contract amounts to an unreasonable restraint of trade: among them, the per se, rule of reason, and quick look analyses. *See Agnew*, 683 F.3d at 335–37. "All of these methods of analysis are meant to answer the same question: 'whether or not the challenged restraint enhances competition.'" *Id.* at 335 (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999)).

We may dispense with the rule of reason inquiry if the restraint falls into a certain subset of agreements, known as "per se" violations. "*Per se* violations are actions where the nature and necessary effects that result are so plainly anticompetitive

that an in-depth analysis of their illegality is unnecessary." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, 433 F.3d 1024, 1032 (7th Cir. 2006). In those cases, an unreasonable restraint "is conclusively presumed once the first is proved," *see Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705–06 (7th Cir. 2011), because "the probability that these practices are anticompetitive is so high," *NCAA*, 468 U.S. at 100.

Both horizontal price fixing and bid rigging are presumptively unlawful under § 1 of the Sherman Act. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful."); *Agnew*, 683 F.3d at 336 ("Horizontal price fixing and output limitation are classic examples of behavior that is considered anticompetitive per se."); *United States v. Fenzl*, 670 F.3d 778, 780 (7th Cir. 2012) (explaining that bid rigging is a form of horizontal price fixing).

On appeal, plaintiffs maintain that the 2003 Contract amounts to a per se unlawful agreement and therefore is an unreasonable restraint under § 1 of the Sherman Act. They advance several theories, among them that the contract represents (1) horizontal price fixing, and (2) bid rigging. As we will elaborate below, the 2003 Contract does not fall into either of these per se categories and plaintiffs have waived any arguments under the remaining analytical frameworks available to plead the 2003 Contract's unreasonableness (i.e., rule of reason, quick look). Therefore, plaintiffs fail to show an unreasonable restraint of trade to state a claim for relief under § 1 of the Sherman Act.

### a. Horizontal Price Fixing

We begin with price fixing. "A Sherman Act combination 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price' in the marketplace is illegal *per se*." *Tri-Gen*, 433 F.3d at 1032 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)). While horizontal price fixing warrants a per se presumption of unreasonableness, *see id*; *Texaco*, 547 U.S. at 5, that presumption does not attach to all forms of price fixing.

For example, as relevant here, the Supreme Court has held that certain vertical price restraints do not receive per se treatment. *See Leegin*, 551 U.S. at 899, 907 (holding that "a per se rule of unlawfulness" is inappropriate for "judg[ing] vertical price restraints" and overruling cases to the contrary). "Vertical price restraints are to be judged according to the rule of reason." *Id.* at 907; *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("Unlike horizontal agreements between competitors, vertical exclusive distributorships (like in this case) are presumptively legal."). We are "cautious about importing relaxed standards of proof from horizontal agreement cases into vertical agreement cases" because "[t]o do so might harm competition and frustrate the very goals that antitrust law seeks to achieve." *Republic Tobacco Co.*, 381 F.3d at 737. We accordingly must ask: Does the 2003 Contract constitute horizontal price fixing such that the per se presumption applies?

We conclude that the answer to that question is no: the multiyear contract between Miller Compressing and the City imposed a vertical restraint on competition, not a horizontal one. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal

restraints," while "those imposed by agreement between firms at different levels of distribution [have been denominated] as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). Through the 2003 Contract, Miller Compressing agreed to charge the City to transport and recycle the metal, and the City agreed to sell scrapped vehicles to Miller Compressing. Read in that light, the parties' relationship is not that of horizontal competitors but rather of a seller (the City sells Miller vehicles) and buyer/service provider (Miller Compressing delivers its purchases from the City tow lot to its facilities and performs evacuation); their contract thus represents a vertical restraint. *See Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) (observing that agreements "between … the buyer … and … the sellers" are "really vertical, rather than horizontal"); *see also Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 660 n.5 (7th Cir. 1987) ("Alleged price fixing between a manufacturer and distributors, however, is more properly termed a 'vertical' conspiracy."). Accordingly, the arrangement between the City and Miller Compressing is not per se unreasonable on the basis of horizontal price fixing. *See Republic Tobacco Co.*, 381 F.3d at 737.

### b. Bid Rigging

Plaintiffs' second theory for why the 2003 Contract was per se unlawful—that the 2003 Contract between the City and Miller Compressing circumvented the J-BID system in a manner giving rise to bid rigging—also cannot rescue plaintiffs' case. "[B]id rigging" is "a form of price fixing in which bidders agree to eliminate competition among them, as by taking turns being the low bidder." *Fenzl*, 670 F.3d at 780. Although we have defined bid rigging loosely, most of our caselaw

appears to treat bid rigging as "a synonym for bid rotation." *See United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994) (interpreting U.S. Sentencing Guidelines' definition of bid rigging and collecting cases in the criminal antitrust context).

Plaintiffs here cannot establish a bid rigging claim for two reasons. First, defendants are not competitors for scrapped vehicles within the J-BID system: the City sells the vehicles, and Miller Compressing and others purchase them. Second, even if they were competitors, at most the City and Miller Compressing interfered with the bid process, rather than rotated the bids. Plaintiffs do not point to, nor could we locate, a case in the civil context that defines bid rigging so broadly. In the criminal context, however, we have rejected the argument that bid rigging "includes all forms of collusion in a bidding process." *See id.* Plaintiffs gesture toward a similar argument here; they allege that the City and Miller Compressing engaged in, as we framed it in *Heffernan*, "some … kind of interference with the integrity of a bidding system," by permitting Miller Compressing to obtain vehicles without bidding. *See id.* (rejecting this broader definition). Given our circumscribed view and without the need to further define what does constitute bid rigging, it is clear this alleged interference with J-BID does not amount to a per se unreasonable trade restraint.

### c. Waiver

In sum, plaintiffs have failed to show the 2003 Contract amounts to horizontal price fixing or bid rigging. Having determined that plaintiffs cannot demonstrate that the City and

Miller Compressing's conduct is per se unlawful,[2] we would traditionally assess whether plaintiffs nonetheless state a legal claim under the rule of reason framework. As we have explained, "a plaintiff's failure to state a *per se* illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason," or otherwise show the unreasonableness of the restraint. *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 210 (7th Cir. 1985).

However, plaintiffs have waived their rule of reason and other arguments. Plaintiffs at most make only brief reference to the unreasonableness of the 2003 Contract in their reply brief without citing any controlling authority. "It is not the court's responsibility to research the law and construct the parties' arguments for them." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008).

Therefore, plaintiffs did not plead sufficient facts to support that the 2003 Contract is per se unlawful and have otherwise waived any argument that this agreement constituted an unreasonable restraint on trade. Accordingly, we hold that plaintiffs' pleadings fail to carry their burden. Plaintiffs cannot state a claim without satisfying all three prongs of the § 1 framework, so we need not proceed any further. *See Agnew*, 683 F.3d at 335, 338 n.4. Plaintiffs cannot state a claim for relief

---

[2] In passing, plaintiffs also refer to output limitations or market allocation as per se unlawful violations of § 1 of the Sherman Act. Even if those arguments were not waived, any agreement to allocate or restrain output is, again, the product of vertical agreement and therefore likely not presumptively unlawful under the Sherman Act. *See, e.g., Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977) (vertical nonprice restraints judged under rule of reason analysis).

under § 1 of the Sherman Act and summary dismissal was appropriate.

### B. Remaining Claims

We briefly address plaintiffs' remaining claims. The district court dismissed the other federal counts in the Complaint, which alleged that defendants violated § 5 of the Federal Trade Commission Act (15 U.S.C. § 45), § 1301 of the Pollution Prevention Act (42 U.S.C. § 13101), § 2 of the Sherman Act (15 U.S.C. § 2), and the Clayton Act (15 U.S.C. § 12, *et seq.*).

Plaintiffs have waived all these federal claims on appeal. Plaintiffs frame the issues before us with only sweeping references to "an antitrust claim" and "antitrust laws," and they do not develop any argument as to how the City and Miller Compressing's conduct amounted to a monopoly for purposes of claims brought under § 2 of the Sherman Act or the Clayton Act. Meanwhile, plaintiffs do not frame the issues in this case as involving Federal Trade Commission Act or Pollution Prevention Act claims (nor do they develop them in their briefing). "As we have repeatedly held, '[t]he absence of any supporting authority or development of an argument constitutes a waiver on appeal.'" *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 709 (7th Cir. 2015) (alteration in original) (quoting *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004)).

### C. Leave to Amend

Finally, plaintiffs assert that the district court erred by refusing to grant leave to amend. "Although Federal Rule of Civil Procedure 15(a)(2) directs courts to 'freely give leave [to amend] when justice so requires,' courts may deny a proposed amended pleading if the amendment would be futile."

*Int'l Union of Operating Eng'rs*, 983 F.3d at 296 (alteration in original).

In this case, plaintiffs have not carried their initial burden to state a claim for relief under § 1 of the Sherman Act. Plaintiffs have also already received an opportunity to remedy these deficiencies when the district court granted leave to amend the original complaint. That plaintiffs subsequently amended but nonetheless proved unable to adequately plead a claim "indicates the futility of granting further leave to amend." *See id.* Dismissal with prejudice was thus appropriate.

### III.    Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court.